

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-8-2004

# Zhu v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-3967

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Zhu v. Atty Gen USA" (2004). *2004 Decisions.* Paper 1107.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/1107

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 02-3967

MAI QUN ZHU,

Petitioner

v.

UNITED STATES DEPARTMENT
OF JUSTICE, ATTORNEY GENERAL
ASHCROFT,

Respondent

Petition for Review of a Decision
of the Board of Immigration Appeals
(No. A70 899 691)

Submitted Pursuant to Third Circuit LAR 34.1(a)
December 18, 2003

Before: ROTH and McKEE, *Circuit Judges*,
and CUDAHY, *Senior Circuit Judge*.*

(Opinion Filed January 8, 2004)

OPINION

McKEE, *Circuit Judge*.

        Mai Qun Zhu has filed this petition for review of a decision of the Board of

_____

        *Hon. Richard D. Cudahy, Senior Circuit Judge, United States Court of Appeals
for the Seventh Circuit, sitting by designation.

1

Immigration Appeals denying his application for asylum and withholding of removal and ordering him deported. For the reasons that follow, we will deny the petition.

## I.

Mai Qun Zhu, age 38, is a native and citizen of the People's Republic of China who arrived in the United States with fraudulent immigration documents on or about June 1, 1992. On June 23, 1993, he filed an application for asylum with the former Immigration and Naturalization Service ("INS").[1] On June 3, 1998, the INS placed him in removal proceedings by filing a Notice to Appear with the Immigration Court. The Notice to Appear charged Zhu with inadmissibility because he did not have a valid unexpired immigrant visa or other valid entry document, pursuant to § 237(a)(1)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(a)(1)(A), at the time of his entry.

On August 5, 1998, at a hearing before an Immigration Judge, Zhu, through counsel, admitted all of the allegations in the Notice to Appear and conceded removability. However, he renewed his application for asylum and withholding of removal. On October 17, 2000, following an evidentiary hearing, the Immigration Judge denied Zhu's application for asylum, withholding of removal, and for relief under the

---

[1]Effective March 1, 2003, the Immigration and Naturalization Service ceased to exist, and its interior enforcement functions were transferred to the Department of Homeland Security, Bureau of Immigration and Customs Enforcement. *See* Homeland Security Act, 116 Stat. 2135, Pub. L. 107-296 § 441 (2002).

Convention Against Torture, as well as Zhu's request for voluntary departure. Zhu appealed that decision to the Board of Immigration Appeals. On September 27, 2002, the BIA affirmed the Immigration Judge's decision without opinion pursuant to 8 C.F.R. § 3.1(a)(7). Zhu then filed a timely petition for review.[2]

## II.

In his written asylum application submitted in 1993, Zhu stated under penalty of perjury that in 1989 he was a student at Fuzhou Normal College. After the events at Tiananmen Square in 1989, he helped student leaders hide from Chinese officials and eventually escape from China. He stated that local authorities discovered his activities and he had to run and hide from city to city to avoid arrest.

In a written statement dated May 13, 1998, and an interview with an INS asylum officer on June 2, 1998, Zhu stated that his wife had been forcibly sterilized after the birth of their second child. When he found out, he was angry and went to the office of the population control authorities to complain. A struggle ensued and he was arrested and locked in an office. The next day, he escaped from a small window. Thereafter he came to the United States.

On October 19, 1998, Zhu renewed his asylum application before the Immigration Court, represented by his former attorney, Robert E. Porges, of New York. In this

---

[2]Zhu does not contest the denial of his claim for relief under the Convention Against Torture or the denial of his request for voluntary departure.

3

application, Zhu stated under penalty of perjury that he married his wife in 1988 and they lived in Yangxia Village, Langqu, Fozhou, Fuijan. After the birth of their daughter in 1989, his wife was fitted with an intrauterine device. However, they wanted more children, so he arranged with a private physician to remove the device. After his wife became pregnant with their son, she went to live with her parents in a distant village.

Zhu's wife gave birth to their son in December 1991 and returned home to Langqi where Zhu remained. Birth control officials learned of the second child and demanded that his wife undergo a tubal ligation. His wife did not want to have the procedure and went to a relative's house to hide. Three days after his wife was scheduled for the operation, local officials came to their house accused Zhu of violating the population control policy, and attempted to take him for a sterilization procedure. A struggle ensued and Zhu escaped and left China for the United States in 1992. In 1994, his wife entered the United States to join him, leaving their two children in China.

On August 16, 2002, Zhu, represented by another New York attorney, Yee Long Poon, submitted an amended asylum application, retracting all the claims made in his previous applications. In this application, Zhu stated under penalty of perjury that, one week after the birth of their son in 1991, population authorities levied a monetary fine on their family for violating the one-child policy. On January 10, 1992, population control officials came to his house when he was not home, and forcibly took his wife to Langqi hospital for sterilization. However, his mother, who had also been at this home, went to

4

see his aunt, who was a surgeon at the hospital, and his aunt agreed to falsify a tubal ligation by making an incision in his wife's abdomen, but leaving the fallopian tubes untouched. Afterward, Zhu's mother told Zhu and his wife what was done. They were relieved, but believed that they could face persecution if they had more children. Zhu left for the United States in 1992. His wife left to join him in 1997, leaving their two children in China.

In his testimony before the Immigration Judge, Zhu admitted that he had fabricated his 1993 asylum application, and that he was never involved in the student democracy movement. He insisted that he was now telling the truth. He testified that family planning officials attempted to take his wife for a sterilization while she was still in the hospital after the birth of their second child. He later changed that, stating that the officials attempted to take her for a sterilization procedure after she had returned home following the birth of their second child. Zhu also stated that he had never been arrested in China. The Immigration Judge asked him if he remembered his interview with the asylum officer in 1998 in which he stated that he had been arrested by population control authorities and placed in a small room, from which he escaped. Zhu stated that his memory was not good ever since he was struck in the head in a construction accident when he was about 19 years old.

Zhu's wife testified on his behalf. She is not legally in the United States and was working without authorization at Zhu's restaurant in Clearfield, Pennsylvania. She

5

stated that after the intrauterine device was inserted following the birth of her first child, she "just removed the device by my own self." Three months later, she became pregnant with their second child and went to hide at her mother's house. After the birth of their second child, she returned home. Four or six family planning officials came to the house and took her to the hospital for sterilization. She was detained at the hospital for four hours. She was taken to an operating room and given an injection that rendered her nearly unconscious. The doctor who performed the operation was Zhu's sister-in-law. After she returned home, her mother-in-law told her about the false surgery.

On May 6, 1986, Zhu's mother obtained from the hospital a certificate of Mrs. Zhu's sterilization, which was presented to the Immigration Court. Zhu's wife was asked why the attending physician listed on the certificate was not Zhu's aunt. Zhu's wife answered that there were two doctors at the hospital who performed the sterilizations, and when Zhu's wife's mother obtained the certificate from the hospital in 1998, Zhu's aunt was not on duty and the other doctor signed the certificate. Zhu's wife confirmed that Zhu had lied about being in the student democracy movement and about being locked in a room by family planning officials.

### III.

The Immigration Judge denied all relief to Zhu, finding that his claims failed for lack of proof and credibility. The Immigration Judge noted that Zhu told widely divergent stories on different occasions, and that three of his asylum applications each

6

differed in their recitation of the facts. The Immigration Judge concluded that based on Zhu's past falsehoods, it was reasonably likely that his most recent testimony was again intended to deceive.

The Immigration Judge also doubted Zhu's wife's claims of false sterilization, finding it unlikely that Zhu's mother could have arranged the deception within hours of Zhu's wife's arrest. Also unlikely was Zhu's wife's statement that no nurses or other attendants were in the operating room to see the deception. The sterilization certificate presented by Zhu's wife containing the name of a doctor other than Zhu's aunt cast further doubt upon her story. The Immigration Judge also found it unlikely that Zhu's wife would have returned home immediately after the birth of her son, if she had been subject to sanctions and possible sterilization. Zhu's wife's statement that she removed the intrauterine device herself also conflicted with Zhu's statement that it had been removed by a doctor.

The BIA affirmed the Immigration Judge's decision in a *per curiam* decision without opinion, stating, "[t]he Board affirms, without opinion, the results of the decision below. The decision is, therefore, the final agency determination. See 8 C.F.R. § 3.1(a)(7).

## IV.

We review the denial of asylum and withholding of removal under a deferential substantial evidence standard. *Abdille v. Ashcroft*, 242 F.3d 477, 483 (3d Cir. 2001).

7

"Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Senathirajah v. INS*, 157 F.3d 210, 216 (3d Cir.1998) (quotation omitted). Under this deferential standard, a finding must be upheld "unless the evidence not only supports a contrary conclusion, but compels it." *Abdille*, 242 F.3d at 483-84 (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n. 1 (1992)).

Credibility findings are also reviewed under the substantial evidence standard. *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002). Therefore, this court must sustain an adverse credibility determination unless any reasonable adjudicator would be compelled to reach a contrary result. *Id.* Because the BIA summarily affirmed the IJ's decision without opinion pursuant to 8 C.F.R. § 3.1(a)(7), we review the decision of the IJ as if it were the decision of the BIA. *See Abdulai v. Ashcroft*, 239 F.3d 542, 549 n. 2 (3d Cir.2001).

## V.

INA § 208 gives the Attorney General discretion to grant asylum to a deportable alien. 8 U.S.C. § 1158(a). But, that discretion can only be exercised if the applicant qualifies as a "refugee." *Id.* The term "refugee" is defined by statute as:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside of any country in which such person last habitually resided, and who is unable or unwilling to avail himself or herself of the protection of that country because of persecution or a well-founded fear of persecution on account

8

of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).   The section of the INA defining a refugee was amended in 1996 to include the following language:

> For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

INA § 101(a)(42)(B), 8 U.S.C. § 1101(a)(42)(B).

The asylum applicant must present some evidence that the alleged persecutors want to punish him "on account of" one of the statutory grounds in order to establish eligibility for asylum.  *INS v. Elias-Zacarias*, 502 U.S. 478 (1992).  The "well-found fear of persecution" standard involves both a subjectively genuine fear of persecution and an objectively reasonable possibility of persecution.  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-31 (1987).  The subjective prong requires a showing that the fear is genuine.  *Mitey v. INS*, 67 F.3d 1325, 1331 (7th Cir. 1995).  Determination of an objectively reasonable possibility requires ascertaining whether a reasonable person in the alien's circumstances would fear persecution if returned to a given country.  *Chang v. INS*, 119

9

F.3d 1055, 1065 (3d Cir. 1997).

Withholding of deportation is closely related to asylum. However, unlike the asylum provision, the withholding provision states that the "Attorney General *shall not* deport or return an alien. . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." INA § 243(h); 8 U.S.C. § 1253(h) (emphasis added). To succeed on an application for withholding of deportation, the alien must establish by a "clear probability" that his life or freedom would be threatened in the proposed country of deportation. *Janusiak v. INS*, 947 F.2d 46, 47 (3d Cir. 1991). "Clear probability" means that it is "more likely than not" that an alien would be subject to persecution. *INS v. Stevic*, 467 U.S. 407, 429-30 (1987). The "clear probability" standard is a more rigorous standard than the "well-founded fear" standard for asylum. *Janusiak*, 947 F.3d at 47. Thus, if an alien fails to establish the well-founded fear of persecution required for a grant of asylum, he or she will, by definition, have failed to establish the clear probability of persecution required for withholding of deportation. *Id*.

## VI.

We hold that substantial evidence supports the Immigration Judge's findings that Zhu's claims of persecution were not credible. Zhu presented four different stories to the Immigration Judge. He shifted the basis of his claims for asylum from persecution

10

because of his political opinion to persecution because of his resistance to a coercive population control policy. In the first story, he claimed to have been persecuted for participation in the student democracy movement. He claimed to have been arrested at the population control office and escaped. He claimed that he was threatened with sterilization by population control officers as his home and escaped. He then admitted that these three stories were fabrications and told a fourth story – that his wife was taken to a hospital where a false tubal ligation was performed by his aunt. In addition, Zhu's wife stated that Zhu had lied about being in the student democracy movement and about being locked in a room by family planning officials.

Given that Zhu admitted that he lied to the court three times previously, the Immigration Judge was certainly entitled to find that his most recent story about his wife undergoing a false tubal ligation was also a fabrication. Zhu presented no reason for the Immigration Judge to believe that he suddenly decided to become honest and testify truthfully.

Moreover, there are unexplained and illogical inconsistencies, contradictions and implausibilities in the stories Zhu told. A few examples suffice. In June 1998, Zhu testified under oath to an asylum officer that his wife had been taken for a forced sterilization, which precipitated Zhu's arrest at the population control office, from which he escaped through a small window. However, in October 1998, after Zhu's wife became pregnant with their third child, Zhu changed the story he told in June 1998 and

11

said that his wife had not been taken for a sterilization but had hidden at a relative's house. In his most recent story, Zhu claimed that his wife was taken from their house in 1992 for a tubal ligation after the birth of their second child, but the procedure was faked by his aunt, the surgeon. Yet, Zhu's wife claimed that the surgeon was Zhu's sister-in-law. Notwithstanding that conflicting testimony, the Immigration Judge found it implausible that Zhu's mother could have arranged for such an elaborate deception to take place within a few hours of Zhu's wife's alleged abduction. Finally, the Immigration Judge was skeptical of Zhu's wife's explanation for the signature of a doctor other than Zhu's aunt on the sterilization certificate. Zhu's wife's assertion that Zhu's aunt was not available to sign the certificate when it was requested in 1998, and that is was signed by another surgeon instead, was questionable given that Zhu's wife had no way of knowing who was at the hospital when the certificate was obtained by her mother in May 1998.

## VII.

Because we find that the record suggests the Immigration Judge's findings that Zhu's claims of persecution were not credible, we will deny the petition for review.[3]

---

[3]Zhu also argues that the Board of Immigration Appeals summary affirmance procedure pursuant to 8 C.F.R. § 3.1(a)(7) violates his constitutional right to due process. However, we recently rejected that argument and need not discuss it here. *Dia v. Ashcroft*, 2003 WL 22998113 at *5-10 (3d Cir. Dec. 22, 2003)

TO THE CLERK OF THE COURT:

Please file the foregoing Opinion.

/s/Theodore A. McKee
Circuit Judge